dissenting.
¶ 47 In Atkins v. Virginia, the Court set forth a “substantive restriction” on the states, prohibiting the execution of the “mentally retarded.” 536 U.S. at 321, 122 S.Ct. 2242. In so doing, the Court made clear, both expressly and implicitly, that the category of those protected by its holding would be those classified as mentally retarded by clinical standards.[9] Although that holding also provides the respective states some substantive and procedural leeway in enforcing this constitutional restriction, no language in Atkins invites states to conjure their own definitions of the condition independent of clinical standards. Indeed, both the state and majority appear to concede that substantive statutory definitions of mental retardation must, at minimum, generally conform to the prevailing clinical definition of the condition to properly enforce the Eighth Amendment restriction on the execution of the mentally retarded.
¶ 48 Our own supreme court has observed that Arizona’s statutory standard for evaluating impairment of adaptive functioning deviates from the clinical standard. Grell II, 212 Ariz. 516, ¶ 62, 135 P.3d at 709. It did so in the context of addressing an evidentiary claim raised and addressed exclusively under state law. See id. ¶¶ 58-63. Our highest court has neither considered, nor purported to address, the considerably more complex question of federal constitutional law raised by this case: whether, in spite of our statute’s varying standard for evaluating adaptive functioning, that section of our statute substantially conforms to clinical diagnostic criteria and, therefore, Eighth Amendment standards.[10]
¶ 49 As shall be demonstrated below, Arizona’s standard for evaluating impairment in adaptive functioning departs, in practical application, so markedly from the parallel clinical standard that it precludes the diagnosis of mental retardation for most of those who would be so defined by clinical standards. For that reason, I can only conclude that Arizona’s standard for determining mental retardation fails to enforce the constitutional restriction set forth in Atkins, and therefore *235 runs afoul of the Eighth Amendment to the United States Constitution.
In prohibiting the execution of the mentally retarded, Atkins employed the clinical definition of that condition.
¶ 50 In Atkins, the Court determined that “mentally retarded” offenders are “categorically excluded from execution” by the Eighth Amendment. 536 U.S. at 318, 122 S.Ct. 2242; accord id. at 320-21, 122 S.Ct. 2242. Because the exclusion is categorical, all those who fall within the Court’s definition of mental retardation are exempted from capital punishment.
¶ 51 There can be little doubt that the Court defined mental retardation by the diagnostic criteria universally accepted by clinicians. In framing the issue presented by Atkins’s case, the Court noted, and comprehensively recited, the definitions for mental retardation adopted, respectively, by the American Psychiatric Association (APA) and the American Association on Mental Retardation (AAMR) (now the American Association on Intellectual and Developmental Disabilities (AAIDD)). Id. at 308 n. 3, 122 S.Ct. 2242. Thereafter, the Court expressly anchored its reasoning in the clinical diagnostic criteria for that condition and clinical understandings of the capacities of persons so diagnosed. See id. at 317-21, 122 S.Ct. 2242. In that reasoning, the Court itemized the disabilities that the “clinical definitions of mental retardation require,” it specified the effects of those deficits on criminal culpability, and it concluded that those deficiencies justify categorical exclusion of the mentally retarded from eligibility for the death penalty. Id. at 318-21,122 S.Ct. 2242.
¶ 52 Thus, the United States Supreme Court has defined the class of mentally retarded persons ineligible for capital punishment with express reference to the deficiencies displayed by those diagnosed with the condition under clinical criteria. Those criteria, as specifically articulated by both the AAMR and the APA are: (1) significantly subaverage intellectual functioning; (2) significant limitations in adaptive functioning in two or more specific skill areas, namely “communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety”; and (3) onset before age eighteen. Id. at 308 n. 3,122 S.Ct. 2242, quoting DSM-IV at 41. As legal commentators have observed, “under Atkins v. Virginia, the Eighth Amendment protects individuals who meet the AAIDD/ AAMR criteria for mental retardation or the virtually identical criteria of the DSM-IV-TR.” John H. Blume et al., Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases, 18 Cornell J.L. & Pub. Pol’y 689, 691 (2009).
Arizona’s statute deviates substantially from the clinical definition.
¶ 53 Here, the trial court did not apply the clinical definition of mental retardation in concluding that Williams was not intellectually disabled. Rather, the court applied Arizona’s statutory definition of mental retardation set forth in § 13-753(K)(3). As the court acknowledged in its order, that definition deviates from the clinical standard in its criteria for determining whether an offender suffers from a significant impairment in adaptive functioning. In Grell II, the Arizona Supreme Court described this variance when addressing a state law challenge to a trial court’s findings:
The defense claims to have clearly shown ... deficits in two of the eleven areas listed in the DSM-IV and therefore [the defendant] has mental retardation. The DSM-IV definition of mental retardation, however, while similar in overall meaning, is not the same as the statutory definition. The statute requires an overall assessment of the defendant’s ability to meet society’s expectations of him. It does not require a finding of mental retardation based solely on proof of specific deficits or deficits in only two areas.
212 Ariz. 516, ¶ 62, 135 P.3d at 709 (citation omitted).[11]
*236 ¶ 54 Specifically, Arizona’s statute requires a court to evaluate a defendant’s “[a]daptive behavior” by a global assessment of “the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant’s age and cultural group.” § 13-753(K)(1). By contrast, clinical definitions of mental retardation, as adopted by Atkins, require a clinician to consider seria-tim how a defendant performs on each of an array of specific life skills. See DSM-IV at 41 (itemizing eleven specific skill areas); AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992) (itemizing ten). By those clinical standards, individuals are diagnosed as mentally retarded if they show significant limitations in a couple of those skill areas— even if they exhibit strengths in most others. See DSM-IV at 41 (definition for mental retardation met if person has limited functioning in two of eleven areas).[12]
¶ 55 For example, a defendant in Arizona must show he is significantly impaired overall in the adaptive category of “social responsibility” to be classified as mentally retarded under our statutory definition. See § 13-753(E)(1), (3) (requiring showing of significant impairment as to both “personal independence and social responsibility”). But no such showing is required under clinical definitions of mental retardation. Indeed, under the current AAIDD diagnostic standard, “social responsibility” is identified as but one of eight nonexclusive sub-factors to consider in evaluating “social skills,” a category which, in turn, comprises a nonexclusive criterion for evaluating adaptive behavior. AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports 44 (11th ed. 2010) (hereinafter AAIDD Manual).
¶ 56 In essence, then, Arizona law precludes the diagnosis of mental retardation for any individual who fails to show significant impairment in both broad categories of “personal independence” and “social responsibility.” And the determination required by statute involves an “overall assessment,” Grell II, 212 Ariz. 516, ¶ 62, 135 P.3d at 709, that implicitly allows strengths in some adaptive skills to outweigh significant impairments in others.
¶ 57 Clinical definitions of mental retardation include no parallel requirement that a person with significantly subaverage intelligence also demonstrate significant deficits in both “personal independence” and “social responsibility.” Indeed, a person need not exhibit overall impairment in either broad category. Rather, evidence of significant impairment in any two of many discrete skill areas is considered sufficient — together with a finding of significantly subaverage intelligence with the onset before age eighteen — to classify an individual as mentally retarded. And, by clinical standards, individuals may receive such a classification regardless of how well they may perform in other skill areas pertinent to adaptive functioning.
¶ 58 Not surprisingly, the diagnostic approach adopted by clinicians conforms to clinical understandings of the behavior of most mentally retarded persons. As the definitional manual published by the AAIDD instructs: “Individuals with an [intellectual disability] typically demonstrate both strengths and limitations in adaptive behavior. Thus, *237 in the process of diagnosing [intellectual disability], significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in some adaptive skills.” AAIDD Manual at 47 (emphasis added). According to the DSM-IV, mildly mentally retarded persons “usually achieve social and vocational skills adequate for minimum self-support” and, with appropriate supports, “usually live successfully in the community, either independently or in supervised settings.” DSM-IV at 43 (emphases added).[13] Indeed, in this ease, Williams presented a longitudinal study, through Dr. Weinstein’s testimony, which found that thirty-six percent of those identified as mentally retarded in high school later “lived independently,” and seventy-nine percent either became employed, received technical training for employment, or attended higher education.[14]
¶ 59 In application, therefore, the difference between Arizona’s statutory definition of mental retardation and the accepted clinical definition is neither semantic nor trivial. Rather, Arizona’s statutory definition produces categorically different results in identifying the class of persons diagnosed as mentally retarded. While both definitions require evidence of significant impairment in adaptive behavior, Arizona requires that such impairment be considered globally and be manifested as to personal independence and social responsibility. But, by clinical standards, persons suffering from mild mental retardation typically can demonstrate either personal independence or social responsibility, and most possess notable strengths in some skill areas pertinent to those general statutory categories. Thus, Arizona’s statutory requirements substantially narrow the class of persons who are defined as mentally retarded when compared with the class of those who would be clinically defined as such.
¶ 60 Although our legislature may well have drafted § 13-753(K) with the intention of correctly defining mental retardation in conformity with clinical standards,[15] and thereby complying with the holding of Atkins, the language of § 13-753(K) falls short of achieving that goal. In my view, Arizona’s statutory definition cannot exclude the “typical” person suffering from mental retardation and yet comply with Atkins’s command that those suffering from mental retardation be categorically ineligible for execution. See Pruitt v. State, 834 N.E.2d 90, 110 (Ind.2005) (permissible variation in defining adaptive functioning cannot constitutionally exclude “a majority of those who fit clinical definitions”).
The improper standard affected the outcome of the hearing.
¶ 61 The record before us shows that the above flaws in Arizona’s statute defining intellectual disability had a demonstrable effect on the trial court’s ultimate conclusion that Williams does not suffer from mental retardation. In its exhaustive and conscientious minute entry, the trial court specifically noted the variation between the clinical standard for mental retardation and that set forth by § 13-753(K)(1), and the court adopted the statutory one.
¶ 62 In conformity with the statutory standard, the trial court evaluated Williams’s adaptive behavior “overall” by considering whether he displayed a “wide variety of difficulties” in activities of daily living and whether he had difficulties living “independently in the world.” In the court’s view, these inquiries essentially captured the statutory definition for adaptive behavior. The court then expressly found Williams’s display of one discrete adaptive skill — the ability to cook for a *238 group of people — to be dispositive evidence that he could live independently. According to the court, “[a] finding that [Williams] was unable to live independently is not possible when he could cook for ten people for a year.”
¶ 63 Given that the trial court understood Arizona’s statutory definition of mental retardation to require a showing that the defendant could not live independently, this finding essentially resolved the question of the defendant’s mental retardation under § 13-753(K)(1) and (3).[16] But, as discussed above, no clinician would exclude the diagnosis of mental retardation based on a person’s display of a single adaptive strength. Indeed, as the above clinical definitions make clear, most mentally retarded individuals possess some useful life and vocational skills, and most mildly mentally retarded persons can be taught such skills.[17] As commentators have noted, when state standards allow fact-finders to place dispositive weight on individual adaptive strengths, those standards encourage diagnostic conclusions anchored in fundamental misunderstandings of the condition. Blume, supra, at 707-08. That appears to be what occurred in the case before us.[18]
¶ 64 The majority suggests that any such defect in the court’s analysis would be harmless because the court also found that Williams had failed to present clear and convincing evidence of onset before age eighteen. But here, where the trial court lacked evidence of an IQ test conducted on Williams before age eighteen, evidence of his adaptive functioning as a youth necessarily had heightened importance in the court’s assessment of whether his mental retardation had a juvenile onset. Any conclusion that Williams had demonstrated significant impairment in his adaptive functioning as a child would have countered the testimony credited by the trial court that Williams’s intelligence level was higher as a juvenile than as an adult.
Atkins cannot be construed as inviting states, without limitation, to redefine the nature of the substantive constitutional restriction set forth in that case.
¶ 65 The state suggests we may overlook any statutory deviation from prevailing clinical standards because the United States Supreme Court has, in Atkins, invited the states to develop their own substantive definitions for mental retardation. It contends this invitation occurred in the following portion of that opinion:
To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this ease, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regal’d to insanity, “we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.”
*239 Id., at 405, 416-417, 477 U.S. 399,106 S.Ct. 2595, 91 L.Ed.2d 335.
Atkins, 536 U.S. at 317, 122 S.Ct. 2242 (alterations in Atkins). But this paragraph, by its terms, only invites states to develop “ways to enforce” the constitutional restriction imposed in Atkins. No part of that language suggests the states are likewise entrusted with the power to redefine the substance of the constitutional restriction itself. As Chief Justice Rehnquist correctly observed in his dissent, the very point of the majority opinion was to limit Virginia’s power, and that of its judges and sentencing juries, to determine who has presented “an insufficiently compelling reason to lessen their individual responsibility for the crime.” Id. at 321-22, 122 S.Ct. 2242 (Rehnquist, C.J., dissenting). That intention can likewise be found in the unambiguous words of the majority’s ultimate holding that “the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender.” Id. at 321, 122 S.Ct. 2242, quoting Ford, 477 U.S. at 405, 106 S.Ct. 2595 (emphasis added).
¶ 66 I would therefore decline the state’s suggestion that we construe a portion of the Court’s reasoning in a fashion so at odds with the clear intent expressed in its ultimate holding. Indeed, if courts accept the state’s interpretation of the language, nothing would prevent individual states from requiring an IQ below fifty-five to demonstrate mental retardation or erecting a presumption that a defendant’s ability to commit first-degree murder itself demonstrates sufficient intelligence to qualify for execution. Such potential legislative definitions of that condition would render the Atkins holding irrelevant in practical effect and would eviscerate any meaningful “substantive restriction on the State’s power” to take the life of a mentally retarded offender.[19] Id.
¶ 67 Rather, the above language relied upon by the state is correctly construed as reserving in the individual states the power to erect a procedural framework by which those suffering from mental retardation are identified. Notably, in the pivotal sentence of that paragraph, the Court invites states to “‘develop!] appropriate ways to enforce’” constitutional restrictions “[a]s was our approach in Ford v. Wainwright.” Atkins, 536 U.S. at 317, 122 S.Ct. 2242, quoting Ford, 477 U.S. at 416-17, 106 S.Ct. 2595. To avoid any confusion, the Atkins Court provided specific references to the portions of Ford that exemplified that approach. See Atkins, 536 U.S. at 317, 321, 122 S.Ct. 2242. In those portions of Ford, the Court exclusively analyzes the procedural mechanisms by which Florida identified insane offenders exempt from execution. 477 U.S. at 405, 416-17, 106 S.Ct. 2595. Indeed, the specific quotation that the Atkins majority lifts from Ford — the “develop[] ... ways to enforce” language — was used in the Ford opinion itself to refer to the development of such “procedural safeguards.” 477 U.S. at 416-17, 106 S.Ct. 2595. Not surprisingly, therefore, our own supreme court has read that paragraph as providing procedural discretion to the states. See Grell II, 212 Ariz. 516, ¶¶ 24, 26, 41, 135 P.3d at 701-02, 705 (interpreting Atkins as providing states authority “to develop appropriate procedures” to identify those who are mentally retarded, specifically the power to set forth the burden and standard of proof for mental retardation at pretrial hearing); accord People v. Vasquez, 84 P.3d 1019, 1022 (Colo.2004).
¶ 68 The majority correctly observes that the supreme courts of both the United States and Arizona have also understood Atkins as permitting states to set forth substantive definitions of mental retardation that are not facsimiles of clinical standards. See Bies, 556 U.S. at 831, 129 S.Ct. 2145; Roque, 213 Ariz. 193, ¶ 149, 141 P.3d at 402. But neither court has suggested that states are entitled to create wholly novel definitions of that condition, independent of the accepted clinical understandings of mental retarda *240 tion and therefore unlimited by how Atkins employed that term. Rather, these cases are properly read as providing states enough definitional leeway to avoid hypertechnical challenges to statutes that properly enforce the substantive constitutional restriction set forth in Atkins, a restriction unquestionably anchored in clinical definitions of mental retardation. See Bies, 556 U.S. at 831, 129 S.Ct. 2145 (acknowledging state procedural and substantive flexibility in “‘developing appropriate ways to enforce the constitutional restriction’ ” by determining who is mentally retarded “within Atkins’ compass ”), quoting Atkins, 536 U.S. at 317, 122 S.Ct. 2242 (emphasis added); Atkins, 536 U.S. at 317 & n. 22, 122 S.Ct. 2242 (allowing states variability to the extent necessary “‘to enforce the constitutional restriction upon [them] execution of sentences’ ” and noting in footnote thereafter that non-identical statutes defining mental retardation “generally conform” to clinical definitions), quoting Ford, 477 U.S. at 416-17, 106 S.Ct. 2595 (alteration in Atkins); Roque, 213 Ariz. 193, ¶ 149, 141 P.3d at 402 (articulating Arizona’s authority to define mental retardation in context of challenge to Arizona’s IQ threshold, but emphasizing Arizona’s statutory threshold arose from “accepted medical definitions” of mental retardation).
¶ 69 As Appendix 1 aptly demonstrates, those states that have addressed the question of variation have almost universally concluded that state definitions of mental retardation need not strictly adhere to clinical ones. See Appendix l.[20] But none of those opinions suggest that states may deviate from clinical understandings of mental retardation without limitation. To the contrary, those cases which have squarely contemplated the limits of state flexibility have concluded that conformity with clinical standards is still required. See Pruitt, 834 N.E.2d at 108 (observing “[t]he Eighth Amendment must have the same content in all United States jurisdictions” and concluding state definitions of mental retardation “at odds with” clinical definitions “would not satisfy” Atkins); Bowling v. Commonwealth, 163 S.W.3d 361, 375 (Ky.2005) (recognizing Supreme Court “left it to the states to formulate their own definitions, so long as they ‘generally conform[ed] to the clinical definitions’ established by the AAMR and the American Psychiatric Association as approved in Atkins ”), quoting Atkins, 536 U.S. at 317 n. 22, 122 S.Ct. 2242 (alteration in Bowling); Chase v. State, 873 So.2d 1013, ¶¶ 61-66, 68-72 (Miss. 2004) (noting ambiguity of Atkins’s “national consensus” language, but concluding constitution prohibits execution of all mentally retarded offenders, not subset thereof, and adopting clinical definitions as standard).
¶ 70 In Pruitt, the Indiana Supreme Court addressed a very similar problem to the one presented here. There, the trial court assessed the defendant’s adaptive functioning by adopting an analytical approach that would predictably characterize only those with an IQ below sixty as mentally retarded. 834 N.E.2d at 108-09. Observing that such an approach would “eliminate approximately 75 to 89 percent of all individuals clinically diagnosed as mentally retarded under the standard medical definitions,” the supreme court reversed the trial court’s finding and concluded that “[although variation is permissible, it cannot go to the point of excluding a majority of those who fit clinical definitions.” Id. at 110. As discussed above, the analytical approach to adaptive functioning compelled by Arizona’s statutory standard likewise precludes the diagnosis of mental retardation for most of those who would be so defined by clinical standards.
¶ 71 In short, Atkins expressly reserves in the states the power to install varying procedural frameworks for engaging in the factual determination as to whether a defendant is clinically mentally retarded. Presumably to preclude hypertechnical challenges to statutory definitions of clinical mental retardation, the language from Atkins has also been understood to allow some variation in statutory efforts to define the condition itself. But, the *241 Court authorized that flexibility exclusively to “ ‘enforce the constitutional restriction’ ” it had imposed upon the states. Atkins, 536 U.S. at 317, 122 S.Ct. 2242, quoting Ford, 477 U.S. at 416, 106 S.Ct. 2595. That restriction, as Atkins makes unambiguously clear, is that the mentally retarded, as that condition has been clinically understood, are not eligible for execution.
In discussing the national consensus against the execution of the “mentally retarded,” the Court did not intend to alter the clinical definition of that condition.
¶ 72 In the same vein, the state contends the Atkins majority had no intention to “adopt any particular definition of ‘mental retardation’ as a constitutional metric.” Instead, the state posits that “the nature of the legal question, whether a national consensus existed, defines the scope of the holding.” In so arguing, the state directs us to language in Atkins leaving individual states the task of identifying those who “fall within the range of mentally retarded offenders about whom there is a national consensus.” 536 U.S. at 317,122 S.Ct. 2242.
¶ 73 The state is correct that the core legal question resolved in Atkins was whether sufficient national “consensus” had developed for the Court to conclude that “‘evolving standards of decency’ ” forbade the execution of the mentally retarded. Id. at 311-12, 122 S.Ct. 2242, quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). But the presence of a consensus implies a shared understanding of the topic of consensus. For this reason, the Court could not have plausibly suggested a national consensus about mental retardation if it believed the respective states could understand that term to mean markedly different things.[21] Not surprisingly, then, no text in Atkins suggests any significant dispute regarding the definition of “mental retardation” around which the Court found a national consensus had developed. To the contrary, at the outset of its opinion, the Court frames the issue presented in the trial court by quoting verbatim the clinical standards for diagnosing that condition. Id. at 308 n. 3, 122 S.Ct. 2242. And, as discussed, in the paragraphs immediately leading to the Court’s holding, it expressly describes the logic and content of the national consensus with express reference to “clinical definitions” of mental retardation. Id. at 317-18, 122 S.Ct. 2242. In so doing, the Court recites, for a second time in the opinion, the clinical definition itself. Id. Thus, there is little ambiguity as to the definition of mental retardation employed by the Court when describing the national consensus of attitudes toward the execution of the mentally retarded.
¶ 74 Nor does the Court’s particular discussion of a “national consensus,” id. at 316, suggest any other definition of mental retardation. In section III of the opinion, the Court exhaustively marshals the evidence of that consensus. Id. at 313-17. Therein, the Court separately itemizes (1) those states that had prohibited the practice of executing the mentally retarded, (2) those states that allowed the practice but had never done so, (3) those states that had done so rarely, and (4) the variety of religious and health organizations that had opposed the practice. Id. Notably absent in that discussion is any effort to qualify, modify, or redefine the meaning of the term “mental retardation” in any of those contexts. Rather, the Court uses the term generically and in conformity with its preceding reference to the clinical definition. And, within the Court’s discussion of national consensus, it applies clinical understandings of mental retardation when it presumes that those few individuals executed since Penny v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), with IQs *242 below seventy, were mentally retarded. Atkins, 536 U.S. at 316, 122 S.Ct. 2242.
¶ 75 In a lone footnote, the Atkins majority acknowledges some minor variation in statutory language used by states to define mental retardation. See id. at 317 n. 22, 122 S.Ct. 2242 (“The statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3, supra.”). But, the Court notes that variation not to suggest any disagreement among the states as to the consensus understanding of what mental retardation entails, but rather to reinforce the conclusion that a true national consensus had coalesced around a shared definition of the condition — the “clinical definitions set forth in n. 3.” [22] Id.
¶ 76 Thus, there is no evidence in the Court’s actual discussion of the national consensus that it intended to define “mental retardation” as a legal term of art, varying from state to state based on the political views of each state legislature, untethered to the accepted clinical definitions of that condition. Rather, within its discussion of national consensus, the Court logically employs the consensus definition of that term (and indeed its only recognized definition): a specific scientific classification of mental disability. In context, then, when the Court refers to a “range of mentally retarded offenders about whom there is a national consensus,” id. at 317, 122 S.Ct. 2242, it is referring to the spectrum of offenders that would be clinically defined as mentally retarded. It is not referring to a range of varying definitions of the condition.
¶ 77 Ultimately, when the Atkins Court held that evolving standards of decency placed “‘a substantive restriction on the State’s power to take the life’ of a mentally retarded offender,” id. at 321, 122 S.Ct. 2242, quoting Ford, 477 U.S. at 405, 106 S.Ct. 2595, implicit in that holding was the definition of mental retardation that the Court itself had set forth and repeatedly used in formulating its opinion, the only definition in existence around which a national consensus could develop.[23] Put another way, the Court’s restriction on the states would neither be effectively “categorical” nor “substantive” in the absence of a concrete definition of mental retardation.
The Arizona Supreme Court has neither addressed nor resolved the issue.
¶ 78 Lastly, my colleagues maintain that the Arizona Supreme Court has already addressed and resolved the question here and *243 that we are consequently bound by that decision. Specifically, they observe that in Grell II, our supreme court identified the primary differences between the statutory definition for mental retardation and the DSM-IV standard and nonetheless found no fault with the trial court’s application of the statutory standard. See Grell II, 212 Ariz. 516, ¶¶ 62-63, 135 P.3d at 709.
¶ 79 That passage, quoted at length in ¶ 53 supra, indeed identifies and articulates differences between the statutory definition of mental retardation and the clinical one. But it does not purport to address the question we must answer here: whether that deviation constitutes a violation of Eighth Amendment standards set forth by the United States Supreme Court in Atkins. The passage from Grell II, which addresses a challenge to the sufficiency of a trial court’s findings under Arizona law, makes no mention of Atkins, the United States Constitution, or any other federal case law. See 212 Ariz. 516, ¶¶ 58-63, 135 P.3d at 708-09. It undertakes none of the reasoning necessary to consider whether Atkins requires substantial conformity to the clinical definition or whether Arizona’s statute, notwithstanding the noted deviations from the clinical definition, so conforms.
¶ 80 The majority speculates that the Grell II passage implicitly resolved the federal constitutional issue we face here because the. court had addressed other analogous federal constitutional challenges to our statute in the same opinion. See supra ¶¶ 38-39. But, the discussion of the requirements of Atkins occurred in a separately headed section of the opinion and addressed only the authority of our state to erect its own procedural framework to enforce Atkins. See Grell II, 212 Ariz. 516, ¶¶ 21-49, 135 P.3d at 701-07. Grell II did not address the extent of the state’s authority to redefine the class of persons eligible for execution under Atkins.
¶ 81 Finally, the majority suggests our supreme court resolved the question here when it observed in a footnote in a prior case that Arizona’s statute “appears to comport substantively and procedurally with the principles set forth in Atkins.” Grell I, 205 Ariz. 57, n. 4, 66 P.3d at 1241 n. 4. But that observation did not address any specific claim raised in the case before it, and was therefore dicta. Moreover, the court employed the phrase “appears to,” suggesting it was not purporting to have definitively considered or resolved all future Ai/cms-based challenges to the statute. Indeed, when Grell later raised a host of claims that Arizona’s procedural framework violated Atkins, the court exhaustively addressed those claims on their merits, and it declined to cite its previous footnote as authority for rejecting them. See Grell II, 212 Ariz. 516, ¶¶ 21-49, 135 P.3d at 701-07. Thus, the supreme court manifestly did not view itself as resolving any specific Atkins-based challenges to the statute when it authored the Grell I footnote.
¶ 82 Although we are bound by the holdings of our highest state court, I cannot assume our supreme court has resolved an issue of such gravity and legal complexity without engaging in any of the reasoning necessary to do so, without identifying the constitutional issue it was intending to address, and without citing the pivotal case controlling that issue. See Calnimptewa v. Flagstaff Police Dep’t, 200 Ariz. 567, ¶ 24, 30 P.3d 634, 639 (App.2001) (appellate opinions should not be read as authority for matters not “specifically presented and discussed”). Nor would such an assumption be consistent with our own rules for determining which claims have been properly presented by litigants and resolved by our courts. Claims based on state statute, state constitution, state common law, and federal constitutional law are not identical, even in the context of similar underlying facts, and it is not our courts’ custom to decide distinct legal claims not raised by a party. See, e.g., State v. Ovante, 231 Ariz. 180, ¶ 18 & n. 1, 291 P.3d 974, 979 & n. 1 (2013) (supreme court will review properly developed constitutional claims, but court “does not consider or address unsupported constitutional claims”); State v. Tison, 129 Ariz. 526, 535, 633 P.2d 335, 344 (1981) (constitutional issues precluded when not raised below, even though defendant objected to admission of evidence on other grounds); State v. Alvarez, 213 Ariz. 467, ¶ 7, 143 P.3d 668, 670 (App.2006) (hear *244 say objection insufficient to preserve claim based on Sixth Amendment Confrontation Clause); see also Ariz. State Bank v. Crystal Ice & Cold Storage Co., 26 Ariz. 205, 211, 224 P. 622, 623 (1924) (statutes presumed constitutional until question of constitutionality properly raised before court).
¶ 83 In determining what issues a court’s holding has resolved, we must necessarily be guided, as all trial courts and attorneys must, by the court’s own description of the issues it purports to be addressing and resolving. Thus considered, I cannot find any indication in either Grell I or Grell II that our supreme court intended to address or resolve the question now before us.
Conclusion
¶ 84 My colleagues’ scholarly rebuttal suggests some non-trivial explanations for why the Court in Atkins appeared to allow the respective states a measure of flexibility in defining mental retardation: respect for the salutary effects of federalism and the traditional deference owed the states in formulating punishments. But in my view, we must also recognize that the Atkins majority invited flexibility to enforce its holding, not eviscerate it. Nor can we overlook that the Atkins holding itself expressly places a substantive restriction on traditional state authority to determine punishment. Because Arizona’s statutory standard for determining adaptive functioning would disqualify most mentally retarded persons from the protection of Atkins, it exceeds the bounds of any flexibility the Court intended to provide states in enforcing the constitutional restriction. I therefore respectfully dissent.
Appendix 1
State Court Decisions Addressing Definitions of Mental Retardation after Atkins Did Atkins leave substantive definition
State of MR to states?_Source_
AL_Yes_Morris v. State, 60 So.3d 326, 339 (Ala.Crim.App. 2010)
AR_Yes_Anderson v. State, 163 S.W.3d 333, 354-55 (Ark. 2004)
AZ Yes State v. Grell, 212 Ariz. 516, ¶¶ 24-25, 62, 135 P.3d 696, 701, _709 (2006)_
CA_Yes_People v. Jackson, 199 P.3d 1098, 1107, 1109 (Cal. 2009)
CO_Yes_People v. Vasguez, 84 P.3d 1019, 1022 (Colo. 2004)_
FL_Yes_State v. Herring, 76 So.3d 891, 894 (Fla. 2011)_
GA_Yes_Stripling v. State, 711 S.E.2d 665, 668 (Ga. 2011)_
ID_Yes_Pizzuto v. State, 202 P.3d 642, 649 (Idaho 2008)_
IL Yes People v. Pulliam, 794 N.E.2d 214, 236-37 (Ill. 2002) (but _death penalty no longer available in Illinois)_
IN_Yes_Pruitt v. State, 834 N.E.2d 90, 109-10 (Ind. 2005)_
KY_Yes_Bowling v. Commonwealth, 163 S.W.3d 361, 376 (Ky. 2005)
LA_Yes_State v. Turner, 936 So.2d 89, 92 (La. 2006)_
MO_Yes_State v. Johnson, 244 S.W.3d 144, 150 (Mo. 2008)_
MS_Yes_Chase v. State, 873 So.2d 1013, 1027-28 (Miss. 2004)
NC_Yes_State v. Poindexter, 608 S.E.2d 761, 765 (N.C. 2005)
NJ Yes State v. Jimenez, 908 A2d 181, 183, 189 (N.J. 2006) (but _death penalty no longer available in New Jersey)_
NM Yes State v. Trujillo, 160 P.3d 577, 581-82 (N.M. Ct.App. 2007) _(but death penalty no longer available in New Mexico)
NV_Yes_Ybarra v. State, 247 P.3d 269, 273 (Nev. 2011)_
OH_Yes_State v. Were, 890 N.E.2d 263, ¶¶ 175-76 (Ohio 2008)
OK_Yes_Smith v. State, 245 P.3d 1233, ¶ 3 (Okla.Crim.App. 2010)
PA_Yes_Commonwealth v. DeJesus, 58 A.3d 62, 81 (Pa. 2012)_
SC_Yes_State v. Laney, 627 S.E.2d 726, 730 (S.C. 2006)_
*245 TN Yes Coleman v. State, 341 S.W.3d 221, 234 (Tenn. 2011); Howell v. State. 151 S.W.3d 450, 457 (Tenn.2004)_
TX Yes Ex parte Briseno, 135 S.W.3d 1, 4-8 (Tex.Crim.App. 2004) (Supreme Court left procedure to states, absent Texas legislative enactment, adopting AAMR definition or _definition in Texas Health and Safety Code)_
UT_Yes_State v. Maestas, 2012 WL 3176383, ¶¶ 187-88 (Utah 2012)
YA_Yes, by implication Burns v. Commonwealth, 688 S.E.2d 263, 264 (Va. 2010)
Appendix 2
State Statutory Standards for Determining Mental Retardation
Requires Requires Requires 2 + diminished diminished diminished
intellectual adaptive adaptive IQ Prior to
State ability? behavior? behavior? threshold? Age Source
AL Yes Yes No None “Develop- Ala. Code § 15-24-2(3) (de-mental period” fines MR for defendants generally, cited in Morris v. State, 60 So.3d 326, 339 (Ala. Crim.App.2010) for definition in capital prosecution)
AR Yes Yes No Presumption of 18 Ark. Code Ann. § 5-4-618 _MR at IQ of 65_
AZ Yes_Yes_No_70_18_A.R.S. § 13-753(K)(3), (5)
CA Yes_Yes_No_No_18_Cal.Penal Code § 1376
CO Yes Yes No No “Develop- Colo. Rev. Stat. § 18-1.3-__mental period” 1101
CT Yes Yes No two standard 18 Conn. Gen.Stat. § 1-lg deviations (death penalty no longer _below mean_available in Connecticut)
DE Yes Yes Yes 70 18 Del.Code Ann. tit. 11, _§ 4209(d)(3)_
FL Yes Yes No two standard 18 Fla. Stat. § 921.137 deviations below mean
GA Yes Yes No No “Develop- Ga. Code Ann. § 17-7 -131 mental period”
ID Yes Yes Yes 70 18 Idaho Code Ann. § 19-_2515A(1)_
IN Yes Yes No No 22 Ind.Code § 35-36-9-2
KS Yes Yes No two standard 18 Kan. Stat. Ann. §§ 21-deviations 6622(h); 76-12b01(d) below mean
KY Yes Yes No 70 “Develop- Ky. Rev. Stat. Ann. mental period” § 532.130
LA Yes Yes No No 18 La.Code Crim. Proc. Ann. _ art. 905.5.1(H)(1)
MD Yes Yes No 70 22 Md.Code Ann., Crim. Law _§ 2-202(b)(l)(i)-( ii)
MO Yes Yes Yes No 18 Mo.Rev.Stat. § 565.030(6), found unconstitutional on other grounds by State v. Whitfield, 107 S.W.3d 253, _ 261 (Mo.2003)
NC Yes Yes Yes 70 18 N.C. Gen.Stat. Ann. § ISA-2005
NE Yes Yes No Presumption of None MR at IQ of 70 Neb. Rev. Stat. § 28-105.01(3)
*246 NM Yes Yes No Presumption of None MR at IQ of 70 N.M. Stat. Ann. § 31-9-1.6(E) (death penalty no longer available in New Mexico)
NV Yes Yes No No “Developmental period” Nev. Rev. Stat. § 174.098(7)
NY Yes Yes No No 18 N.Y.Crim. Proc. Law § 400.27(12)(e) (death penalty no longer available in New York)
OK Yes Yes Yes 70 18 Okla. Stat. tit. 21, § 701.10b(A)-(B)
SC Yes Yes No No “Developmental period” S.C.Code Ann. § 44-20-30(12) (defines MR in health context, cited in death penalty case State v. Stanko, 2013 WL 696816, *16 (S.C. Feb. 27, 2013))
SD Yes Yes No Presumption of 18 no MR if IQ greater than 70 S.D. Codified Laws §§ 23A-27A-26.1, 23A-27A-26.2
TN Yes Yes No 70 18 Tenn.Code Ann. § 39-13-203
TX Yes Yes No two standard “Develop-deviations mental period” below mean Tex. Code Ann. § 591.003 (defines MR in health and safety code, adopted as part of standard in death penalty cases, Ex paiie Hearn, 310 S.W.3d 424,427-28 (Tex. Crim.App.2010))
UT Yes Yes No No 22 Utah Code Ann. § 77-15a-102
VA Yes Yes No two standard deviations below mean 18 Va. Code An n. § 19.2-264.3:1.1(A)
WA Yes Yes No 70 18 Wash. Rev.Code § 10.95.030(2)

. As the majority correctly points out, "intellectual disability” is now the preferred term for "mental retardation.” For the sake of analytical clarity as to the specific issue presented here, I have elected to use the term employed in Atkins.

. Although I agree with the majority that the defendant failed to squarely raise this claim in his initial petition to this court, he did maintain generally that the trial court's consideration of the evidence violated the Eighth Amendment requirements set forth in Atkins. He thereafter more specifically complained that the respondent judge's evaluation of the evidence of adaptive functioning departed from clinical standards. Moreover, both parties were provided an opportunity to address the specific question we address here in supplemental briefing. At any rate, we do not ignore fundamental error when we find it in the record. State v. Musgrove, 223 Ariz. 164, ¶ 4, 221 P.3d 43, 45 (App.2009). Because application of the correct definition of mental retardation goes to the core of this proceeding designed to enforce the Eighth Amendment restriction described in Atkins, the constitutional error here is fundamental and prejudicial.

. As the majority indicates, the former A.R.S. § 13-703.02(K) discussed in Grell II was renumbered § 13-753(K), 2008 Ariz. Sess. Laws, ch. 301, § 26, and then amended to substitute the *236 term "intellectual disability” for the term "mental retardation.” 2011 Ariz. Sess. Laws, ch. 89, § 5. The statute has remained the same in material part.

. The AAIDD has since revised its diagnostic criteria for intellectual disability to require significant limitations in "adaptive behavior,” which is defined as "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.” AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports 43 (11th ed. 2010) (hereinafter AAIDD Manual). Behavior in each of those three categories is evaluated with reference to specific itemized life skills which incorporate the eleven skill areas listed in the DSM-IV criteria. See AAIDD Manual at 44. And deficits in all areas need not be established to classify an individual as mentally retarded. Indeed, an individual is deemed to have significant limitations in adaptive behavior if he or she performs on standardized measures "approximately two standard deviations below the mean” in any of the three types of adaptive behavior: conceptual, social, or practical. Id. at 43. Thus, the revised AAIDD definition is not a meaningful departure from either the DSM-IV criteria or the AAMR’s prior definitional standard set forth in Atkins.

. The DSM-IV also observes that people with "mild mental retardation,” those with an IQ of fifty-five to seventy, make up about eighty-five percent of those classified as mentally retarded. DSM-IV at 42-43. Given that there is little practical difficulty in diagnosing those with an IQ below fifty-five, the correct identification of those with "mild mental retardation” is, for all practical purposes, the central task of an Atkins hearing.

. Dr. Weinstein so testified with reference to an exhibit that was not made part of the record. Accordingly, no citation to the study is available.

. The text of § 13 — 753(E), which requires expert witnesses to use accepted psychological testing procedures to evaluate a defendant for mental retardation, suggests such a legislative intent.

. The trial court's remaining analysis of Williams's adaptive functioning repeatedly dismissed evidence of adaptive impairment with reference to competing evidence of adaptive strengths, an approach arguably compelled by Arizona's "overall assessment” standard. Grell II, 212 Ariz. 516, ¶ 62, 135 P.3d at 709.

. Indeed, Williams’s supervisor stated she had to direct him how to properly shop for those meals "until he learn[ed] how to do it.” Thus, Williams’s adult ability to cook for a group was, in part, taught behavior. See DSM-IV at 43 (defining those with "mild mental retardation” as "educable” and observing they usually achieve vocational skills). Dr. Weinstein also directly testified that the ability to cook does not foreclose a finding of mental retardation, noting that his own son, who suffers from Down syndrome, is a very good cook.

. As our supreme court implied in Grell III, 231 Ariz. 153, ¶¶ 5, 10, 291 P.3d at 351-52, Arizona’s procedural scheme necessarily requires a jury to independently determine, during the mitigation phase of a capital trial, whether a defendant is mentally retarded. Yet jurors are even less equipped than experienced trial judges to avoid lay misunderstandings of mental retardation when faced with the provocative facts of a capital case. Instructing those jurors with correct clinical standards thus becomes especially important in that context.

. This concern is not far-fetched. As Justice Scalia notes in his dissent, Kansas's statutory definition of "mental retardation” does not include the mildly mentally retarded, Atkins, 536 U.S. at 343 n. 2, 122 S.Ct. 2242 (Scalia, J„ dissenting), a group which, under clinical diagnostic criteria, makes up eighty-five percent of those classified as mentally retarded. DSM-IV at 43. And, as demonstrated above, Arizona's statutory definition of adaptive functioning has the practical effect of excluding most of those clinically classified as mildly mentally retarded.

. Several of the cases cited in the appendix concern only procedural questions such as the timing of an Atkins determination, the appropriate fact-finder, and the burden and standard of proof. See, e.g., Vasquez, 84 P.3d at 1023; State v. Turner, 936 So.2d 89, 94, 99 (La.2006); State v. Jimenez, 188 N.J. 390, 908 A.2d 181, 188-89, 191-92 (2006); State v. Poindexter, 359 N.C. 287, 608 S.E.2d 761, 767 (2005); State v. Laney, 367 S.C. 639, 627 S.E.2d 726, 731-32 (2006).

. Given that "mental retardation” is in fact a clinical term, rather than a politically defined term of art, the Court's assumption that each state shared that understanding of the term was not unreasonable. Although to the majority “it seems unlikely the Supreme Court would have delegated the interpretation of the Eighth Amendment to clinicians,” supra ¶ 42, I find it more unlikely that the Court would have invited the states to substantially redefine the nature of the substantive restriction on their own authority to determine punishment. In context, it seems especially unlikely that the Court would have endowed lay legislators with the authority to substantially redefine a medical condition, when the Court's holding is itself anchored in the nature of the condition as clinically described.

. As discussed above, the language of then § 13-703.02 suggests Arizona's legislature intended to express clinical understandings of mental retardation in statutorily defining the condition. And, the Atkins majority correctly identified that legislation as evidence of a trend against the execution of the mentally retarded. 536 U.S. at 315 n. 15, 122 S.Ct. 2242. But I cannot agree that, in so acknowledging the efforts of the respective states to statutorily prohibit the execution of the mentally retarded as evidence of evolving social norms, the Court intended to thereafter preclude any future conceivable specific Eighth Amendment challenge to those referenced statutes. Notably, the Atkins majority cited Kansas’s statute as an example of the growing national consensus against executing the mentally retarded. 536 U.S. at 314 & n. 12, 122 S.Ct. 2242. But, as Justice Scalia emphasized in his dissent, Kansas’s statutory definition of mental retardation would exclude the mildly mentally retarded, a group that Scalia acknowledges are now unambiguously exempted from execution by the holding of Atkins. Id. at 342-43 & 343 n. 2, 122 S.Ct. 2242 (Scalia, J„ dissenting). Moreover, the majority clearly contemplates that the states would, as a response to its holding, be generating legislation designed to "enforce the constitutional restriction upon [their] execution of sentences.” Id. at 317, 122 S.Ct. 2242, quoting Ford, 477 U.S. at 416-17, 106 S.Ct. 2595 (alteration in Atkins).

. The state and the majority observe that clinical definitions may evolve. The state therefore suggests it would have made little sense for the Court to adopt any particular clinical definition. Indeed, as noted, one of the two organizations providing a clinical definition at the time of Atkins, the AAMR, has since changed its own name, the name of the condition formerly called mental retardation, and the wording (but not the substance) of the definition of that condition. But the fact that the prevailing clinical definition of mental retardation could conceivably evolve does not demonstrate that the Court in Atkins intended to eschew clinical definitions in favor of political ones. Unlike clinical definitions, which represent a widely accepted scientific consensus, the respective states have no duty to form any consensus definition of the condition. For this reason, state definitions of mental retardation would provide no jurisprudential stability at all except to the extent they incorporate recognizable clinical standards.